The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. Thank you. Please be seated. Judge Wynne and I are very glad to welcome Judge Groh this morning who is going to help us. And we're going to take up argument in United States v. Banks et al. So what we'll do is go down each of the appellant's counsel in the order they're listed and it shows you the amount of time you're allocated. And then when the opening arguments are concluded, we'll go to Mr. Gray and then come back and go down the same way. Now if somebody wishes to cede part of their time to somebody else, you can do that. You just need to tell us. So we've added some time here. We'll try to give you a little leeway, but not a whole lot. So with that, we'll begin with Mr. Berman. May it please the Court. I'm Stuart Berman. I represent Shakeen Davis, but I speak for all the appellants regarding the new trial issue. The government indicted and convicted these appellants using a substantial quantity of evidence that it obtained as a result of wiretaps and search and seizure warrants where the affiant was Ivo Lovato, a Baltimore City police detective and federal task force officer. The government could not have charged or proven this case without this evidence. But in swearing out the affidavits for the wiretaps and warrants, Lovato repeatedly concealed from the issuing judges that he himself was a criminal, a corrupt police officer who stole drugs, resold them, and pocketed the proceeds. The district court and the government say that whatever Mr. Lovato provided, he was not the sole source of any of the factual basis, and that whatever he provided was cumulative. So the way I would address that, Your Honor, is that there are plenty of wiretaps and search warrant affidavits in the record here, and we all know what they look like, and the judges don't even get to the probable cause, the substantive evidence, unless they first accept the affiant's qualifications. We'll just, for simplicity's purposes, call the affiant's qualifications Part 1, and then the evidence is being summarized as Part 2. And the Part 1 qualifications establish that the affiant is a law enforcement officer, either for purposes of Title 18 or Rule 41, and that the affiant is experienced and credible and someone whose inferences and deductions deserve deference. The information that Lovato omitted from Part 1 nullifies his qualifications before the affidavit even gets to Part 2. Well, was there anything that wasn't true that was contained within the affidavit for the warrant? Well, we have not challenged that the Part 2 here establishes probable cause, but I would submit, Your Honor, that the district court analysis presumes that, you know, the probable cause determination could stand because the government could hypothetically or retroactively swap in an affiant who doesn't have Lovato's baggage, but they can't do that. The government concedes that. The Supreme Court and this Court have made clear that the probable cause analysis is limited to what was presented to the judge at the time the warrant was sworn out. On the Rule 33 argument like this, it's found favor. It looks like to me that it's because whoever was the corrupt officer, those actions occurred in that criminal case. And here, sort of like in our earlier decision in Robinson, his actions were both temporarily and factually far separate. He had nothing to do with this case in terms of his prior criminal acts. So why wouldn't that be controlling here? Well, Your Honor, I would submit this as a starting point, that there's not a single judge in the country, certainly not a district judge or a magistrate judge in this circuit, who would approve an affidavit if the Part 1, the qualifications, had disclosed that the affiant himself was a drug-dealing criminal. They would have escorted the affiant out the door and told the AUSA to go find somebody else. Well, if that were the case, then a lot of these Rule 33 cases would have come out the other way. I'm not aware of any of the Rule 33 cases, Your Honor, where the critical allegation was that the affiant himself was a criminal and was fundamentally disqualified, was not credible in any way to be the person summarizing the evidence. You know, these are ex parte proceedings in which, of course, of necessity ex parte, but judges place great faith, great trust in law enforcement officers to accurately summarize the information. You make a good point that if you'd known this from the first instance, you probably wouldn't have. The issue here, as Judge Agee has alluded to, goes to the question of materiality. And, you know, when you look at this, there are different factors, and you really get that fifth factor. And what I don't see here is a defendant-by-defendant analysis or a count-by-count analysis that would indicate that without this evidence, your client would have been probably acquitted. Notwithstanding also the fact, in terms of the cumulativeness of it, is that basically anything that is said here that could be attributed to this if it had occurred, and even if you do dismiss it, it appears quite likely this evidence is coming from others. And all you do is substitute one of the other officers in for it. The end result being is, and I'm just going to cut to the chase with you, we can go on back and forth. You're not really arguing with the court. We're discussing it with you. And we're giving you a direction right now in terms of how this is going. But if you feel like you are strong enough to continue on it, go there. But you see where I'm going with this? This evidence is pretty strong against this type. It does not match up with Fisher nor Lowell in terms of the kind of evidence that we would do that in. So otherwise, there's no limited principle to the case. Judge, let me point you to something that the government itself told the district court about the indispensability of this evidence. Because remember, as of the time the first wiretap was sworn out, June 30th. But you see, that's the point, the evidence. But where did the evidence come from? That's the question. It did not come – he got it from others. And that's where you kind of – there's a weak link in this. Well, our position, Your Honor, is that the weak link is part one. The weak link is the qualifications of the affiant because the judge simply would not have accepted this person as an affiant if the omitted information had been disclosed. I would also point out that – Your Honor, Judge Winslot, is there any of the evidence that you say that this bad officer was the sole source for? Well, what the government told the district court, Your Honor, is that this entire case hinged on his wiretap, on these wiretap affidavits. That may be true, but was he the sole source? There are very limited portions where he was the sole source. But that's not the gist of our argument, Your Honor. The gist of our argument is what the government admitted to the district court at Joint Appendix 433 and 434, that the two-month-long wiretap investigation was successful in gathering sufficient evidence to obtain search warrants, that the search warrants relied on the intercepted communications, that the warrants were successful, that the result was this 24-defendant indictment. Because you have such limited time, and I think your point is being made here, your client is Davis. Yes. Speak to that RAHEF issue that's in there, as well as the Amendment 821 issue, the retroactive. Well, I don't think we raised an 821 issue, Your Honor. We did raise a RAHEF issue, and I would simply submit that the record is to Mr. Davis is that he was in a low-level – What about the RAHEF issue? Yes, that's what I'm talking about, Your Honor, that he was an 18-year-old – It was a plain error review. It's a plain error review. This is on all fours with Baronet. There's nothing in the record that suggests that he was ever informed that he was a prohibited person. And we would submit – Is anyone else going to discuss the RAHEF issue? We're the only defendant with that count because the government, at Mr. Anderson's sentencing, acknowledged RAHEF error and dismissed the 922G count against Mr. Anderson. All right. So let's just assume there's a RAHEF error. Right. What do you say we should do then? Well, it depends on the court's decision as to the other counts, but vacate that count. Well, as to the RAHEF. Yeah, that you reverse that count of conviction under a plain error standard because there's no evidence – Does he get resentenced? The government suggests it could be kind of a ministerial resentencing, and that would probably be – Again, it depends on the outcome of the other charges. It looks like the district court and the government both recognized there might be a problem, and the government asked the district court, well, if these counts get tossed on the felon in possession, is that going to change anything? And the district court said, no, I'm going to give the same sentence. So that's why I ask about the resentencing. Remember, also, Your Honor, we've raised a prejudicial spillover argument because without this defective count, the jury would never have been told that Mr. Davis was a convicted felon. I'd like to, if I could, just have just a moment to return to the Robinson issue because I think there's really a – this case, I submit, really goes to the hole that the court left open in Robinson, and I do want to address that very briefly. In Robinson and earlier in Custis, the court quoted Judge Posner and Taglia that there could be a new trial if the government's case rested entirely on the uncorroborated testimony of a single witness discovered after trial to be unworthy because he lied consistently in a string of previous cases. In such a case, the district court could grant a new trial. Lovato was the sole affiant on the wiretaps that informed the entire rest of the case. There was no narcotics conspiracy case, no RICO conspiracy case until that wiretap. He was discovered after trial to be unworthy of belief. He omitted material information on multiple occasions. And Franks and this court in law would have held it would be an unthinkable imposition on the issuing judges if falsehoods and affidavits were completely beyond review. I reserve the remainder of my time. Thank you. You've got some rebuttal time. Ms. Beebe? When you come back, I want you to look at that Amendment 821. You raised that issue on page 25 of your brief, the retroactive aspect of it. I just want you to comment on that briefly. Good morning and may it please the court. Lauren Beebe for Defendant Dante Bailey. I plan to focus my time on the plea agreement and related ineffective assistance of counsel claim that's specific to my client, Mr. Bailey. By August 21st, 2018, the government had made a verbal plea offer of 27 to 40 years. The government later reiterated that same offer on October 3rd, 2018. Mr. Bailey's acceptance of that offer was conveyed to the government on October 9th, 2018. Nonetheless, that deal never got effectuated. And Mr. Bailey was forced to proceed to trial and is now in jail for the rest of his life, subject to the mandatory life sentence that he had agreed to plead guilty to avoid. You're going to have to walk us through to tell us why there's a plea agreement here. I think I just interrupted Judge Agee. He might have been going the same way. But I think that's the whole basis is the question. Was there a plea agreement, a meeting of minds here? Along that line, the government says, and cites places on the record, where these offers were contingent upon everybody pleading guilty. Which obviously didn't happen. I would like to separate. There was an unconditional offer of the 27 to 40 years. And that was the offer that was made by August 21st, 2018. And you can see that at JA6577. There's an email from AUSA Hoffman thanking Ms. Whalen, one of Mr. Bailey's court-appointed trial counsels, for the telephone call and confirming with Ms. Hoffman that she talked it over with the supervisors and they'd prefer to stick to the 27 to 40 range. There was another proposal on the table for a straight term of potentially 37 years or 35 years. And that other offer was contingent on additional defendants pleading guilty. But the 27 to 40 offer was not contingent. And that's made clear during the telephone call on October 3rd, 2018. And we've got affidavits from both Mr. Enzina and Ms. Whalen at JA6579 saying, I spoke with Christina AUSA Hoffman. She said they will do 27 to 40. Ms. Hoffman again restated the government's offer of 27 to 40. And then from Ms. Whalen, you've got the affidavit. So your view is this email and an affidavit of the phone call establishes a contract? The email and the affidavit of the phone calls, both phone calls on August 21 and then also on October 3rd, do demonstrate an unconditional offer for 27 to 40 years. And that offer was accepted by Mr. Bailey. He signed and returned the statement of facts that the government had provided on August 15th. And both of those, his acceptance and the signing of the facts, were communicated again via a phone call on October 9th, 2018. And that's available at JA6564. The government did never sign anything. And that's frankly why we're here today arguing about this, why Judge Blake didn't agree that there was an agreement in place at that time. We did not yet have the affidavits from Mr. Encina and Ms. Whalen that provided the additional color about the verbal offers on the phone calls. They just had the email attachments. The district court didn't have those affidavits before yet? Correct. The district court received those affidavits after trial in order to have a complete record on appeal. So those were supplemented. And she did not have those when she was ruling on the motion to enforce on the morning of trial. Let's fast forward from the communications you've discussed here today that occurred in 2018 to this February 14th, 2019 correspondence from Mr. Bailey's counsel to the government. It's written up like a formal offer from the government, but it's not. It's written by his counsel. And as we can see at the end, and I'm looking at J6600, it was never signed by the government. It just laid out there. Correct. The government never signed any written offer. Ms. Whalen and Mr. Encina repeatedly asked the government to reduce their verbal offer into writing and give it to Mr. Bailey to sign so that they could make it unambiguous and clear that he had accepted their verbal offer. The government did not do that, which is why we're here today. But they never withdrew their offer, and they did not even purport to revoke the offer after learning of Mr. Bailey's acceptance. Instead, they waited 20 days, and then in a phone call on October 29th, purported to unilaterally withdraw the offer for 27 to 40. The later communications in early 2019, those happened during a renewed round of plea negotiations after the first ones evidently fell apart, even though there had been an offer and an acceptance. The government then unilaterally bled on that offer, refused to execute a formal written plea agreement, and then Ms. Whalen and Mr. Encina reengaged in a renewed round of negotiations. I will say, though, and I'll point you to a phone call that is explained at JA6606. It's paragraph 17 of Mr. Encina's affidavit, and that's a January 23rd, 2019 call during which AUSA Hoffman unequivocally indicated that the government would accept a plea from Mr. Bailey for 37 years. And that was not contingent on a wired plea. That was not contingent on any other defendants pleading guilty. And then on February 6th, 2019, they communicated, again, Bailey's acceptance of that offer. The follow-up email that was sent later was because, again, after the government heard that Mr. Bailey had accepted the offer, they basically ghosted trial counsel, and they did not answer calls, they did not respond to emails until a couple weeks later they finally said, oh, we're not doing that offer anymore either, and they suggested a counteroffer of 45 years, which my client did not accept. But there were at least two offers, the first one in the fall of 2018 that was made and accepted, and then the other one in January and February 2019 also made and accepted before the government communicated any kind of revocation or unavailability. Anything else you want to tell us very briefly? What I will say is that to the extent there's any ambiguity about the government's offer or what the government thought they were communicating that's not in the record because we don't have affidavits from, for example, AUSA Hoffman or any internal AUSA communications. We do have the affidavits from Mr. Bailey's trial counsel, from Ms. Whalen and Mr. Enzina, and we submit that those are sufficient to show that there were offers that were accepted by Mr. Bailey and then the government failed to follow through on those deals. We think that's enough to reverse. But to the extent you disagree and you think there's still some ambiguity, we respectfully request that you remand and instruct an evidentiary hearing and additional information now rather than waiting for collateral review, given the importance of this issue and that it would really get rid of all the other issues, at least as to my client, Mr. Bailey. All right. Thank you. You've got some rebuttal time. Mr. Zirkin? May it please the court, Cheryl Zirkin representing Randy Banks. Mr. Banks was only convicted of the drug conspiracy, so we're in a situation different than the other appellants. I'd like to address first Issue 12, that the sentence was procedurally unreasonable. First, the court selected at offense level the insurance company, and then tried to justify it with calculations. And that really stands the procedure on its head. And that's clear from JA 6397. The calculations were fundamentally flawed. It was speculation relied on what the judge admitted was a very small sample and was undeniably so. The court said that those transactions corroborate a course of dealing over years, but the corroboration evidence is the same as the course of dealing evidence. You can't use the course of dealing evidence. You can't use the same evidence that supposedly corroborates it. And that is all clear at JA 6431-32. U.S. v. Heckman, this court prohibits the kind of speculation that the judge engaged in in this case and required particularized evidence of dealing. Now, the element in the room, if you will, is the 500-gram trap house incident. The court's reliance was improper for two related reasons. First, the 500 grams would exceed the 280 grams, which was the limitation, the cap. You call it speculation. I think case law sort of calls it. Even evidence that you've been acquitted on can be used in a sentencing. That's correct, isn't it? Well, two – I probably didn't fairly put those two together, but that latter part is true, is it not? That even evidence upon which a defendant might have been acquitted could be used in sentencing. Here is the difference, Your Honor. So if you have an offense element of which the jury doesn't find, or if you have a charged offense which the jury doesn't find, that is acquitted conduct. And then because that is proof beyond a reasonable doubt, the judge can apply preponderance of the evidence and consider that evidence. That's not what we have here. The trap house evidence is not either of those things. It is simply evidence. It was not subject to a standard of proof. We don't instruct juries, you must find the underlying evidence by some standard. You use your common sense. So there was no standard that the jury applied in rejecting the trap house evidence. And so what you have is simply the jury's rejection of evidence, and then you have the court considering that evidence. And that is inconsistent with the jury verdict. Even if the court said that she found that was attributable to the offense conduct by preponderance of the evidence? But she can't get there because the jury rejected it. We know the jury rejected it because the jury said less than 280, so they had to reject the 500, or they would have gone above 280. So the jury rejected the evidence. She can't then, it's inconsistent with the jury verdict for her to then rely upon evidence that we know the jury rejected. Not an element, not an offense, but just evidence. And we know that from the Tillman and Burgos cases from this court and Curry and Weston. So she could not consider that evidence because there is no different standard of proof, which is what we usually deal with. That's the government standard argument all the time. The courts have accepted it. Different standard of proof. There is no different standard of proof here. It was evidence. The jury rejected the evidence. It wasn't subject to a standard of proof. The judge decided, I'm going to consider that evidence. The jury rejected it. And that is improper. So what else you got for us, Mr. Serkin? Yes, Your Honor. So issue 10B is that the court failed to instruct on lesser included offenses. First, counsel did object to the verdict for him, and he submitted his own. Excuse me. That's it. JA 6396. The court's verdict form gave two options, one for 280 grams or more or less than 280 grams. The less than 280 grams conflates two lesser included offenses. That is, 28 or more, but less than 280, and less than 28. You know what the dividing point here is? Excuse me, Your Honor. The dividing point, at least the understanding I have of it, is you mentioned the less than, the 280, and you assumed that the greater than 280 was unanimous, and therefore a rejection. Not necessarily so. You just couldn't get a unanimous agreement on it. So that does not lead to the idea that it only could be at least 280. That's sort of the dividing line of the understanding I'm getting on this. I'm sorry, Your Honor. In relation to which issue, what I'm arguing now? Well, the first issue you brought up was related to at least that quantity. Yes. That whole proposition that, well, it was less than 280, therefore the sentencing could not encompass something that was more. Well, we know that the jury did not. It's not unanimously. Because that's like contact-to-thumb decision. They don't make a decision by any standard in which they have to be unanimously, but they didn't include it in their calculation. So they rejected the evidence. Well, if there was an error here, wouldn't that to the benefit of your client because it gave him the zero to 20 years when they found it under 280? I mean, and if they would have found, as you'd argued, for over 28 grams, then it would go to 5 to 40. So I don't see what the problem is. But not when you get to the guidelines. When you get to the guidelines, you then have the situation where the court, just as the court realized. Right, but you're talking about the jury instruction. Right. But I'm talking about whether or not it was to his benefit or not. I'm saying ultimately. I agree that it's to his benefit on the maximum, minimum. I agree with that. Where it's not to his benefit is the fact that if the jury found less than the 28, then the court would have been restricted to a lower sensing range. The court recognized she was restricted to the less than 280. She would have recognized she was limited to the less than 28. We've given you some extra bonus time, Mr. Zarkin. I appreciate it, Your Honor. We have time on rebuttal. Ms. Hernandez. Good morning, Your Honors. May it please the court. I represent Cor Lloyd Anderson. And I just want to argue about the district court judge's upward variance, which was a substantial variance in this case. And it was procedurally and substantively in error for two reasons. One, there's no basis for granting that upward variance. It would create a unwarranted sentencing disparity in violation of 18 USC 3553A6. And even if the court had discretion, the reasons it gave were insufficient. And that in itself is an error. So the court essentially, the guideline range, and just to be clear, Mr. Anderson, there was no quantity determination at sentencing. Essentially, we were driven by the jury verdict. The jury found him guilty of the 10-year mandatory minimum, and that was the quantity that was used. But there's no quantity. I mean, there's four phone calls in the pre-sentence report that don't identify any particular quantity. So we're just driven by that 10-year mandatory minimum. And no time was there finding that there was, you know, like stash house or anything else. He wasn't found with any drugs. He wasn't surveilled with any drugs. There were no hand-to-hand buys. And essentially, the court said, I'm going to – essentially, the court said, I cannot give you a sentence lower than I gave Mr. Banks. That was essentially what drove the judge's upward variance. And that's not fair because the evidence was different. The judge did explicitly reject the notion that my – and the jury also rejected the notion that my client was involved with any violent acts in the RICO conspiracy. The judge explicitly said the two murders that the government suggested my client was involved with, she found that he was not. So we're only talking about a drug conspiracy. No drug quantity. His criminal history is unremarkable. He's got three or four street-level deals dating back years. They're almost stale. They're not stale under the guideline calculation, but they're almost stale. And then his drug quantity, which was the other reason the judge gave, again, there's no finding from which she could say the guideline range is somehow under-represents what actually happened in this case. So it really is driven by what she gave to Banks, but that's not a reason to give. And it is – I just submitted a 28-day letter on the five-year average sentences for offense level 32, criminal history 3. It's 143 months, which is within the range that was calculated in this case. And the judge just gave 264 months. That's completely unfair, unreasonable, substantively and procedurally. My time's almost up. If the court has any questions, I'd be happy to answer. All right, thank you. You've got some rebuttal time, too. Now we'll go to Mr. Gray and get the government's viewpoint. Yes, Your Honor, may it please the court. I'd like to just sort of run through some of the responses to the arguments that we've heard so far here this morning, and I'd like to begin with the Lovato matters, although I believe the court has really already focused in very clearly on the key issues there. The defense, among other things, has conceded in their reply brief that if Lovato had included a statement about his past criminal conduct back in 2009, contrary to what the defense sometimes appears to be trying to make it sound like, there's no evidence in this case that he was engaged in ongoing criminal conduct like the GTTF defendants were. The evidence is that he committed this admittedly very serious offense back in 2009, some seven years before the first of these affidavits was drafted. But the defense has conceded they cannot point to any specific factual item going to the probable cause in that affidavit that is wrong, that is incorrect. Aside from the claim about his own past criminal conduct, they have conceded they cannot point to anything that is a material omission. And I also think it's important for the court to understand and for its opinion to be clear on exactly what the nature of Officer Lovato's representations were in this case. It sort of seems from listening to the defense like there was some kind of general affirmation that I'm a person of good character, I've never done anything wrong, I've never done anything bad. But in fact, the only two things in the affidavits that really seem to fall within the scope of the defendant's argument is first the statements about the confidential sources. And what he simply said there was as to a number of them, CS1 has provided law enforcement with accurate independently corroborated information about narcotics and narcotics organizations in the past. That's it. That's a statement of fact. It's certainly not in the sense that prosecutors think about vouching in arguments to a jury where you're putting your own credibility on the line and saying, you know, I find this to be true. This is a statement about the past history of these informants. And if you look at some of the pages in the affidavits where this appears, which include JA7263 and 7264, that's one of the main ones, you'll see that this is actually, it's very meticulously drafted. On CS2, he acknowledges that there are some issues with CS2, some pretty serious ones. Is it any question that if this officer had disclosed at the time of the application for the warrant to the magistrate that he had stolen cocaine, that that magistrate, no reasonable magistrate, would have issued that warrant? And so the question becomes, why does that demonstrate materiality? Okay. Well, I think what is clear here is, I mean, the hypothetical that the defense is, or the alternative factual scenario that they're using about what if Lovato had included in his warrant the fact that I committed this crime back in 2009. As even the defense concedes in their reply brief, the first thing that would have happened is the prosecutor would have said, that's a problem, that's very serious, we're going to report this to Internal Affairs, we're going to march on from there, you're not going to be the affiant on this matter or on any others in this case. And the defense wants to say, and of course, if Lovato had raised it orally in the meeting... And I understand you can draw from that because this evidence that's within this warrant is really not something he was testifying. Is that your point on that? That's it, exactly. I mean, all you really have here in terms of facts, I mean, there is really no general vouching in terms of his character along the lines of what the defense seems to try to say. Do we draw that as a distinction? I mean, I'm thinking of cases like this, you typically do not want officers, and there have been instances of officer misconduct where warrants have been thrown out, but it does appear to be that thread, a common thread, that the evidence was something that was derived directly from something they had done, not attesting to facts of other officers and incidents and wiretaps and things of that nature. That's right, and I think, Judge, it may have been Judge Agee who asked the question about what specifically did he do, and as we've set forth in our brief, and we set it forth also in our brief in opposition to the new trial motion in the District Court, I think there were only like three items. There was one time when, while working with other officers, he checked the confidential informant to make sure that he didn't have any contraband on him before he went into the deal with one of the defendants. I believe it was one of the defendants. And that entire, aside from his checking physically the informant, the whole rest of the transaction was videotaped and audiotaped. And on top of that, I don't think it was even relied upon at trial. I don't think it even came into evidence at trial. So that's one of the items. A second item was that on one occasion he was assigned to do surveillance at Lockley's residence, and he was alone on that occasion, but he used a video camera to film what he saw that happened. So there was a subjective version of that. And I think there was one final thing, which is escaping me at the moment, but that's all that it was. Is your argument basically that Lovato was essentially a scrivener as opposed to a source? Yes. It's not really an argument. That's the facts. That is largely what he was. And to begin with, among other things, the investigation had already been going on from 2012 to 2015 with Homeland Security, Baltimore County Police, Baltimore City Police, all involved before ATF and Lovato even got involved in it in 2015 or 2016. In terms of the evidence that was derived from, even from the Lovato affidavits taken in their entirety, Mr. Berman suggested on a couple of occasions that the government itself conceded that you couldn't have gotten a guilty verdict, you couldn't have gotten all of this without having the evidence that was derived from him. As we put forth at page 61 in our opposition to the defendant's new trial motion, the Lovato-derived evidence introduced at trial was both quantitatively and qualitatively unimportant. Only 22 exhibits out of a total of 750 government exhibits were derived from the Lovato authorized search warrants, representing less than 3% of the government's total of 748 exhibits. And moreover, even those 22 exhibits were cumulative of staggering amounts of other evidence establishing the defendant's guilt. Moreover, I believe we also stated in there that out of those 22 exhibits, I think the defendants in this case only had standing to challenge like 12 of them. The other 10 exhibits related to transactions in which they weren't involved. And as for the wiretaps, only 11 of the 111 wiretap calls that were introduced at trial came from the Lovato wiretap application. That's at page 62 of our opposition to the defendant's new trial motion. So as some of the comments from the court have already reflected, this case is not remotely comparable to what we saw, for example, in Fisher. And as Judge Blake repeatedly stated, this is at star three of her decision, the defendants do not allege any specific false statements of substantive facts. She further found in her opinion that as to the confidential informants, the substance of his affidavit remains as to the confidential informants he discussed. The statement in his affidavit that I have not deliberately withheld any information that I believe to be material to probable cause here, that can be thought of as basically being an affirmation that is consistent with United States v. Coakley and United States v. Tate. And the defendants themselves have been unable to point to anything that they say he omitted. And yet that's one of the things they try to hang their hats on in terms of saying that his credibility was at issue. Let's see here. With regard to the court has any other questions with regard to the Lovato matter, I'm glad to address those. Otherwise, with regard to the Rehafe matter. What do you want to do with the Rehafe matter here on Davis? Your Honor, I would simply say that's very straightforward. Obviously, the Rehafe decision was handed down after this case was tried, but before sentencing occurred, the matter was taken up and discussed at sentencing itself. We do have something a little, we believe we have something factually that's different here than was the case in Berenat, which is that there was the jail call where Davis talks about having to make sure that his guns are hidden in the woods because there have been police in the area. So how does that show consciousness of felony status? I mean, as opposed to just saying, you know, I don't want the cops to get my guns because I may need them. Your Honor, we would simply say that it is a fact that is available that distinguishes this fact here from what was the case in Rehafe, but that's what we have to rely on. That's it. I don't think there's really much else I would have to offer on that. But you don't have to. I mean, based upon the direction that you see him be going, if you just send it back, correct judgment, it sounds like to me. Yes, Your Honor. You might be asking for it. I don't know. I think the key thing here is that striking this additional Rehafe conviction, this additional felony possession conviction, would not affect Mr. Davis' sentence. Is that because of the question from the government, the district court? Yes. This goes, it's not going to change my mind? That's right. All right. Talk about that Amendment 821, that the Sentencing Commission made that correction, that change in the sentencing guidelines, and then said it's retroactive. Is that something we need to address in so far as with Davis? I don't think so, Your Honor. That was raised, I believe, actually I'm confident it was raised for the first time, by the defense in the reply brief. But they're correct. The amendment says what it says. It had been made retroactive by the time they filed the reply brief. The typical way these kind of 821 amendment issues are dealt with is the defendant files a motion under 3582C. There it is. That's still available. Yeah. You can still do that. But, I mean, out of judicial economy, I mean, why wouldn't we just send it back? Do you think we should just mention it, or should we say you ought to go back and look at it in light of that? It seems to be pretty straightforward. I agree. It is straightforward. This is not anything we're going to make a, we're making a big issue about here. We would simply say that what the court should say here is this issue sort of changed its complexion while this case was being briefed. And which of the defendants does this affect? And could it affect? This affects Davis. Just Davis? Just Davis. And Davis is the one with the regave problem? Yes. Right. Okay. Let's see here. There has been some argument here as to the claim that Mr. Banks had an agreement with the government. But I think if you go through the emails, the correspondence back and forth between counsel, these were all very experienced lawyers, very competent lawyers. Teresa Whalen on the defense side for Mr. Banks. Paul Denzina. It looked like the email, at least the district court, that it was conditioned. But then the opposing counsel made it, no, that's sort of a separate thing. It's not conditioned. They accepted this. An offer is made and acceptance is made. Now the question of the meeting of the minds comes when you go beyond, I guess, the sentencing and other factors that are there. But it's kind of odd. How much time existed, just remind me, when the offer was first made and then the response came back from the defendant? There was a lot of back and forth in early October of 2018. And one of the key moments was when I think the defense lawyers came back like over a weekend. And you see a lot of these emails going back and forth on weekends. And said, okay, we're ready to go. We would now be willing to accept a straight 37, which they had not previously been willing to do. They were wanting 35. And the government had been taking a position that it was going to insist on or that it was going to ask for 40. And the government counsel responded, I'd have to check and see. I don't know if that's still on the table yet or not, or if there are demands on the table or not. And there are emails in here that reflect the fact that our office's criminal chief, Rob Harding, the violent crime chief, Ken Clark, that they were being copied on these. They were being kept informed. The idea that anyone would think that our office had agreed to a plea agreement, which had not yet been reduced to writing. Well, would the plea agreement under your procedures require one or both of those individuals to sign off on it? Yes, they would review them. They review all plea agreements. Every plea agreement that the system concludes, typically, of course, you take it to the supervisor when it's at negotiation stage, have them read over it, decide that there's nothing else they want to raise or nothing they have any issues with. If that's the case, then you can send it out to the defendants. Well, that's a formal process. But you can have an oral agreement. That's the problem we have in here. You can have that oral agreement. And it just seems to me of all these defendants, unless I'm reading these thousand pages here, Bailey, it would seem like anything you would offer short of life, he might be on that immediately before you could hardly get it to his office, it would seem to me. But I know there are other factors, and you're going back and forth, and you can't ever know these things. Well, I think the government indicated pretty clearly at sort of multiple stages in that agreement that it would be asking for 40 years. There were some times when there was some discussion about 37, but it's clear that there was no meeting of the minds, certainly not on the side of the government, because of the way our system works. And in a case of the severity, I mean, this is a defendant who's facing... So what was the initial thing you said? Was that an offer that was sent, or was it just an idea? I mean, I'm trying to understand. There's no meeting of the mind, and the whole signing business doesn't... I mean, I guess that solidifies it, and that makes it formal, but our case law doesn't require it to be signed. It's just an oral agreement. If you send an offer to someone, and typically, I don't want to get too much into contract law, but if it's accepted as it is, that sort of creates a contract right there. But if you add conditions, or if you change it, or you don't meet all the terms, there's not clearly a meeting of the minds, at least with all the terms of it. Well, and I think if you look at the continued conduct of the defense lawyers, from October, there was a postponement of the trial from November, then continuing into January and February, they're still coming back to the government again and again and again. So my question goes, if you had sent that offer, and the next thing you got from them was just two words, I accept, is that a contract? We wouldn't send out an offer like that. So you did not send an offer that you would, you're saying in this case, you didn't... That we would rely on this binding. And this was part of... So why'd you send it? Just to have some discussion? Well, no, I mean, counsel typically will sort of, for one thing, the conversations are typically initiated by the defense, and they ask, what can you, what would you potentially agree with? And here we responded with what we could agree with, which I think was a range of 27 to 40 years, but that we would be arguing for 40 years to the court. And the defendant said, that's not good enough. We want something less than that. My question was, if the defendant had said, that's not good enough, and you said, I accept, right there, is that a contract? I don't think it would be, your honor, because it's understood in our office's dealings with defense counsel that there has to be a review by the supervisor, and the supervisors actually have to put their initials in the upper right-hand corner of page one of a plea agreement before it goes out. That doesn't sound so fair to me. It sounds like to me, you throw out an offer to a defendant, and he says, I accept. You now sort of set the stage, well, I got that. I got a floor there now, but I don't have to take it. I can get more. I mean, it seems like to me, you wouldn't send an offer, or send, you wouldn't put out numbers to them unless you reasonably believe that if they accepted what you put out. And that's not the case, all the case here. I'm just throwing it out as a matter of how do we deal with this kind of issue in an opinion because of the conduct. I think the policy of your argument in terms of what your office does goes to the policy, but that doesn't go to meeting the mind if they don't know about it. And even if the counsel does know about it, you got a defendant sitting there. And you tell this defendant, well, the government has come forth and says 27 to 40, and then he says, I'll take it. And the counsel says, you take it. And he says, well, you took it, but they didn't really kind of offer it because they got a procedure. That's not a meeting of the mind. Well, there's a problem with that. But it might be just going back and forth about issues that are not clearly in this case, but I want to be sure in how we handle this case, what your conduct represents here. Because we do have this whole arching general. It doesn't have to be in writing. It can be orally. Well, among other things, there has to be a factual basis to support it. And even if you start out and you have general understanding that it seems that you can come to an agreement on what the recommendations will be, you've still got to go through the whole process of discussing and negotiating the statement of facts, which typically is the most time-consuming part of the entire thing. Can we consider those affidavits after the motion was ruled on? Your Honor, I would never want to. I mean, there was an extensive hearing on this. Judge Blake considered the issue carefully over the course of the trial. The fact that those affidavits come in, among other things, after the verdicts are returned, I mean, I would not want to suggest that either Mr. Enzino or Ms. Whalen would knowingly put anything false in affidavits like that because I'm sure they wouldn't. I'm asking because I don't remember. Is there an argument in the appellant's brief that utilizes these affidavits as a basis? I just don't remember. Right offhand, I don't recall either. But the issue was substantially considered. I mean, it was considered to the extent that another attorney, a very well-known white-collar practitioner and narcotics practitioner in Baltimore named Jerry Martin, was separately hired by the CJA panel to present this issue to the court. And the brief that you will see on this issue from just in front of the trial in March of 2019 is written by Jerry Martin and his law firm and not by Whalen and Enzino because the idea was that if there were a formal evidentiary hearing, they would have to be witnesses. So their information was already presented to Judge Blake through that very substantial filing from Mr. Martin and his firm. And that's what the court resulted on. And I don't think there was... Well, that's why my question went there. They cite to both those emails and the affidavit. But the question I was asking is those affidavits didn't come until later after the motion. That's correct. That's correct. But their information had previously been presented to the court and was taken into account by the court at the time of the original hearing. And when they presented those affidavits, after they renewed the motion, how did that work? I'm not sure procedurally how that came. I think they... Right offhand, I can't say specifically how that was represented to the court. I assume they did something like that. But the issue had already been resolved, and at any rate, there was no subsequent modification of the court's previous decision, which was rendered shortly before trial. See, that's the problem I've got. They do bring those affidavits, but as I recall, they said they're supplementing what was put there. I don't know if that's a renewal of the motion. It seems to me the procedural thing would be if you have something additional, you come back and ask the judge to now consider this in light of something else that's here, affidavits, other information, judgment, abuse of discretion, all kinds of standards there to deal with it. But if you just say I'm supplementing something you've already ruled on, I guess implicitly you're asking to look at it again, but you didn't do it. Right. Knowing the professionalism of Mr. Martin, and it's reflected in the filings that he made in this matter when he was called upon to act in this role on behalf of the defense counsel, I don't think he would have left out anything that he considered material, and I'm confident that these two lawyers would have advised him of everything that they considered material prior to the trial. That's when this was being presented. It was right on the eve of trial, an attempt to stop the case from proceeding to trial, as to Mr. Pence. Mr. Gray, you told us both of those lawyers, the lawyers who tried the case, were experienced. So I assume that they negotiated pleas before in the District of Maryland with each other and with your office. Is that a fair assumption? It's absolutely a fair assumption, Your Honor, and that's one reason why I find it very surprising that this argument has even been advanced. And typically, how does the rehashing of the terms of an agreement and them boiling it down to an offer work in the District of Maryland? So typically, you'd have to take things far enough so that you have an agreement, which is written up in a totally formal way. By the government, not by the defense attorney, as we have here. Exactly. And then it's submitted to, by the line assistant, to their supervisor, who reviews it, who may make changes. If they approve it, then they will put their initials in the upper right-hand corner of that document. It goes back to the assistant, and typically, assistants don't sign off on anything. Until it comes back from their supervisor. Then they would sign off on it. They would send it out to the defendant and their counsel. And then sometimes, maybe, especially if it's a less complicated agreement, the defendant and their counsel will sign it right away, but what more typically happens is there are requests for changes or further modifications or something different in the statement of facts. And then that all has to, the assistant has to work that up again. The revised draft has to go back to the section chief for their approval, and once again, their initials in the upper right-hand corner of the revised draft. And then the assistant can send it back out for signature. What else do you want to tell us about in your remaining time? Your Honor, I would, as one of my professors in college used to sometimes say, I would be glad to make a gift to the court in my remaining time. But if I might have a point of personal privilege, I would simply like to note that Thursday of this week will mark the 35th anniversary of the first time that I argued before this court, May the 9th, 1989. And I just want to say that my trips down here over the years have been one of the most pleasurable and fulfilling parts of my professional career. All right. Anything else? Thank you very much. All right. We'll go down the list here, starting with Mr. Berman. Thank you, Your Honor. My first argument before this court was only a couple of years after Mr. Gray's, and I would join him in sentiments about the period before this court. Let me begin, if I could, briefly with the Rahafe issue. I think, Judge Agee, you kind of captured the gist of it, that the evidence that the government is relying on doesn't demonstrate any knowledge of him being a prohibited person, just you don't want to get caught with guns. And I think Mr. Gray's response was appropriate and is pretty thin gruel, and I don't have anything else to say on the Rahafe issue. With regard to Amendment 821, I would note, Judge Winn, first of all, that this issue was not waived by being raised for the first time in the reply brief. Our original brief was filed May 8, 2023. The amendment took effect November 1, 2023. If you could bring in another 3582. Well, we're on direct appeal, Your Honor. I'm trying to do it in the most efficient way possible. There's a remedy for that. There is, Your Honor. We raised it in the first. This only affects Dave. Correct, Your Honor. And we raised it in the reply brief in December, right after the amendment took effect. And it would have an effect on Mr. Davis because the probation officer found that he was criminal history Category 2. That's a giant appendix, 7904. The district judge, Judge Blake, raised him to a criminal history Category 3 because of this prior state court conviction. Once that falls out under the amendment, the guideline range would go from 292 to 365 down to 262 to 327. So there is an impact based on. What did he end up with? He ended up with 300, I believe. So if I could then return back to the Lovato issue. Judge Agenor used the phrase, Scrivener, and I think that that's kind of an important point here because to qualify under my phrasing of Part 1, Part 2, to qualify as an appropriate affiant under Part 1, there are several qualifications you need. The first is that you be an agent. If someone named Bartleby went in who was not an agent, that person would be disqualified as an affiant, and the court couldn't accept the summary of the Part 2 evidence no matter how accurate it was. And we submit that the same holds true for Lovato because of his prior conduct. He was a criminal, and that criminal's summary of the remaining affidavit simply doesn't get past the test for what's acceptable for a district judge or a magistrate judge to issue a warrant on. It's not an acceptable basis. Mr. Gray also argued there's kind of a truncating phenomenon in the government's argument. For example, he refers to the 22 Lovato affidavits, but in the representation? The 22 Lovato exhibits. Yes, thank you for the correction. But, you know, we're not talking about simply items that were seized as a result of the warrants that he swore out. The government in its representation to the district court that I quoted earlier, Joint Appendix 433, 434, basically said that the whole case flowed, the whole narcotics and racketeering conspiracy case flowed from the wiretap. And, indeed, at the time of the wiretap, the only thing that had been charged in this case was a felon in possession charge against Mr. Bailey. Everything else, the superseding indictment, the operative second superseding, all took place after that wiretap, and the government has acknowledged the importance of that. I also want to point out that the government has acknowledged the importance of Mr. Lovato's misconduct. Now, the government interviewed him in May of 2018, nine years after the fact, because they were trying to clean up all important matters arising out of the Baltimore police corruption examination. And when he lied about it, they prosecuted him under 18 U.S.C. 1001, and he got 14 months in jail. And it is, I think, inappropriate for the government to argue that there's something insignificant about Mr. Lovato's misconduct that's not disqualifying. And I think it's, frankly, the same issue that the court confronted in U.S. versus Paylor, which is on the one hand the U.S. Attorney's Office wants to prosecute all these corrupt Baltimore City police officers, but they don't want to accept the consequences in the cases where those people were agents. I would also note, very briefly, Mr. Gray raised a standing issue. We addressed that in the district court. It's a joint appendix 7614. These individuals were all persons who were targeted in the wiretap and have standing under U.S. versus Apple, 915 Fed Second 899, and there's no separate standing requirement that governs the downstream warrants. All right. Thank you very much, Mr. Berman. Thank you, Mr. Aitken. All right. Ms. Beebe? Thank you, Ms. Beebe, again for Mr. Bailey. I think Mr. Gray said a couple times it was Mr. Banks. Mr. Bailey is the one with this plea issue. I'd like to just make a few kind of cleanup points here on rebuttal. First of all, I do want to reiterate that plea agreements do not have to be in writing to be enforceable. This court on at least two different occasions has held the government to verbal offers that were accepted, United States versus McQueen at 108F3rd64, Cooper v. United States at 594F2nd12, and then in another case held the government to verbal modifications of a written agreement that was in United States v. Wood at 378F3rd342. I also want to touch on the district court's findings to the extent it made factual findings on what happened. Are they entitled to deference? Factual findings about what was said, yes, are entitled to, I believe, a clear error standard of review, but the interpretation of a plea agreement, including the enforcement of a plea agreement, if there was a plea agreement, that's a question of law that's subject to de novo review, and that includes the question whether there was an offer that was accepted. I do want to say, too, Mr. Gray mentioned a few times that supervisors would have to be involved and approved. The affidavits clearly state that supervisors were involved in these discussions and supervisors were involved in all verbal offers. That's at JA6560. In addition, I would just like to point out that the practice that Mr. Gray described may be the U.S. Attorney's Office preferred practice, but it's certainly not what happened even in this case. The one written offer that Mr. Bailey did approve, it was signed in the top right-hand corner, but with the initials of Christina Hoffman, who was the AUSA who was negotiating primarily with Ms. Whalen and Mr. Enzina, and that was the offer for 45 years that was rejected. But that's the only one that was provided in writing, and that's kind of inconsistent with the government's representations that an offer would have to be signed by a supervisor and would have to be provided in writing to be enforced. I do also want to point something that I believe... Very briefly, because you're over time again. Yes, very briefly. The time period between when the offers were made and accepted for the first offer, it was reiterated on a verbal call on October 9th. Sorry, October 3rd. It was then accepted on October 9th. The government then waited 20 days to say anything, and that's when they purported to unilaterally withdraw the offer. In the second round, the offer was made on February 6th, and it was accepted on February 21st. The government did not do anything until February 27th. So the gaps in those negotiations and in those discussions just are inconsistent with the heightened responsibility that both this Court and the U.S. Supreme Court hold governments to in plea negotiations and demonstrates, I believe, the improper conduct here in that we should get a reversal or at least an evidentiary remand for additional information from the government about this now. All right, thank you very much. Mr. Zirkin? Your Honor, I would only note that I probably argued 20 cases before either of them had argued their first before the Fourth Circuit. And since Mr. Banks was not mentioned, any of the issues involving Mr. Banks were not mentioned, I have no rebuttal. Thank you. All right, Ms. Hernandez? I don't recall when I first argued before this Court, but I was admitted to practice in 1982 and clerked for a federal judge in Baltimore. I didn't hear Mr. Gray mention my argument. I think if I shut up and sit down, I may be ahead and he can't come back with anything else. Thank you, Your Honors. All right, thank you very much. I do note that all of you are court-appointed or acting in a pro bono status, and the Court wants to express its deep appreciation to you for undertaking those roles because without your functioning in our judicial system, we could not dispense justice. So thank you very much. Now I'll ask the clerk to adjourn court for the day, and we'll come down and brief counsel.
judges: G. Steven Agee, James Andrew Wynn, Gina M. Groh